Good morning, judges. May it please the court. I am John Hong. I represent myself. I will split time with Mr. Sanders, who is sitting behind me, and we will reserve one minute for rebuttal. I will focus my argument on why the district court's opinion must be reversed and vacated, even assuming that Garcetti v. Ceballos applies in the academic setting. This case presents the narrow question of whether my speech was made as part of my official duty or whether it was not. According to Posse, a decision by this court in 2008, the professional responsibility in the context of Garcetti is a mixed question of fact and law, and specifically the question of scope and the content of job responsibility is a question of fact. As I established in my opening brief, page 37, the University of California is governed by the Academic Personnel Manual, APM 015, which sets forth two separate categories of action for university professors, professional right and professional duty. May I interrupt you and just ask, are you prepared to talk about qualified immunity issue? Because that's another argument the district court didn't reach it, as to why the individual defendants shouldn't be entitled to qualified immunity in this context. So even if your constitutional right was violated or you have a free speech right, was that clearly established in 2005 in this context? So Garcetti was a subsequent case. In my opening brief and in response brief, there are coverage on qualified immunity. However, the lower court decision didn't mention in its opinion. May I continue? Yes. Now, do you wish to share time with your counsel? Yes. All right. In no fewer than 16 places within district court opinion, the court erroneously substituted phrase of professional duty or professional responsibility for professional right, and that is an error of a constitutional dimension, because speech in connection with professional duty is not protected under Garcetti, while speech in connection with rights is protected. The lower court simply misread the academic personnel manuals, which is deemed a statue in the stamp of California. For example, the district court's decision say, my participation in the university's self-governance is pursuant to professional responsibility. That is wrong. APM say it's my right. However, my conscience tells me that to stand up and to speak up, my belief are my moral duties and moral responsibility. It is not professional duty or professional responsibility. The second example is the lower court states participation in department faculty appointment and promotion is a professional responsibility. Counsel, you're down to almost five minutes. You may wish to let your attorney have the remaining time. Yes. So I'm going to finish. Thank you very much. Thank you, Mr. Hong. Yeah. Good morning, Your Honors. May it please the Court. I'm Steve Sanders representing the AAUP. Mr. Sanders, I think I need to ask you right away, why aren't the regents absolutely immune and the remaining defendants qualifiedly immune in this case? Your Honor, actually, my clients do not have a position on the qualified immunity issue. Our interest does not go to that. Our interest really is clarifying the proper interpretation of Garcetti applied to the academic context. So you're not prepared to discuss immunity, then? I'm not prepared to discuss immunity. My clients do not have a position on the immunity question. The district court opinion completely failed to recognize the reservation in Garcetti for academic speech, a reservation that even the defendants acknowledge. From the district court's opinion, one would have to conclude that a professor could be punished with no First Amendment recourse for speaking, writing, or teaching anything that displeased the campus administration. That is surely not what the Supreme Court could have intended. What's your best authority that any of this was a matter of public concern? Your Honor, I think the best authority is the longstanding position that the Supreme Court and this Court have taken about the importance of academic freedom in the university to the general public, that academic freedom is not a matter of special pleading, but is of transcendent concern to us all. Well, that's certainly true if you're talking about what's being taught in the classroom, but what internal administration of the faculty? How does that apply? Well, I think so, Your Honor. In Mabee v. Reagan more than 30 years ago, this Court said, a college relies in large measure on faculty governance. An attack on those processes attacks the educational process as well. And just last year in Rodriguez v. Merrick. And was that First Amendment speech that was being protected in the case you just cited? I believe that was First Amendment speech. That's right, Your Honor. It took place in the context of departmental governance over classroom teaching. And just last year in the Rodriguez case, the Court said, to afford academic speech the breathing room that it requires, courts must defer to colleges' decisions to err on the side of academic freedom. That wasn't administrative speech, though. I mean, the professor in that case was talking about his opinions on political issues. That's correct. When I look at the Garcetti where they're responding to Justice Souter's separate opinion, they focus on speech related to scholarship or teaching, classroom instruction. And you agree that this was not that sort of speech. Is that right? Your Honor, I would not agree. And I think that's a fundamental question in this case. Professor Hong's speech fell within that reservation because I believe it was plainly related to teaching and scholarship. And let me explain why. Faculty participation in university governance safeguards the integrity of teaching and scholarship. When a professor speaks pursuant to his or her position as a faculty member and expertise as a scholar, it's neither possible nor desirable to pigeonhole that speech, to say some boxes are protected and some boxes are not. A professor is not the agent or the spokesperson for his or her dean or provost. The premise of Garcetti was that workplace speech is not personal to the speaker. But in this setting it is. Academic life is a vocation. Any professor would tell you that. It's informed by years of study and sacrifice and acquisition of expertise. Yet here, if Professor Hong's allegations were to be established by evidence, we have a university punishing a faculty member for the very exercise of that personally acquired academic judgment that the university has invited the professor to exercise. And so I don't think it's possible to make that kind of distinction. I don't think there's an indication the Supreme Court consciously or intentionally meant to cabin teaching, scholarship, shared governance speech in that way. This clearly was speech that was related to teaching and research. It had to do with Professor Hong spoke to employ Justice Frankfurt's terminology in a very famous First Amendment case. His speech was directed to who shall teach and how it shall be taught. Those are among the four freedoms of the university, and that's really a cornerstone on which the Supreme Court's academic freedom jurisprudence has rested. May I reserve the remaining 45 seconds for this argument? Yes, you may, counsel. Thank you very much. Thank you for allowing our participation at arguments. Oh, you're very welcome. We'll hear from the estate. Thank you. Richard Paul speaking first on behalf of the lower-level individual defendants, Grant, Schmittendorf, Alexopoulos, and Heminger. And I'd like to speak to the qualified immunity issue first. Before you proceed, Mr. Paul, are you sharing time with Ms. Wu? I am sharing time with Ms. Wu, and she will speak to the absolute immunity issues that affect the graduates. I will speak to the qualified immunity issues that affect the individuals. I'd like to first respond to two points that were made. Posey, of course, does say that whether speech is within the duties of its question of law and fact, but on this record, the record I think is absolutely clear, the deposition testimony from Mr. Fong, that he was speaking and acting within his role as a faculty member, within the concept of shared governance, and there is really no question of fact to be resolved on that issue. Second, with respect to the remarks of AAUP, it seems to me that the cases that deal with administrative matters within a university make a distinction between government regulation that goes to the content of classroom speech, that goes to scholarship itself, and government regulation that goes, of course, to personnel matters. And following Connick and the cases after Connick, we submit that the action here dealt with, fundamentally, personnel matters that are not matters of public concern. The public concern cases, of course, are of two kinds. One is where the speech relates to some event out there in the community, like a Rankin v. McPherson, the attempted assassination of President Reagan. We don't have that. The second line of cases are those cases where the speech accuses someone in significant roles of illegality in a significant way. Judge Gould's opinion in Mirabel is a good example of that. And we don't have that here either. We simply have no indication on this record that either of those two aspects of public concern are implicated by the record. Was there an issue, though, with the lecturers about some misuse of funds or that it was an inappropriate use of the university's budget that differentiates it from his criticisms of the two faculty appointments? Thank you, no. I submit what the record shows, and Dr. Hong in his deposition admitted, that there was no issue of a violation of a law, rule, or policy. He simply felt in his judgment that it would be a better use of funds if funds were used differently than the department chair thought funds should be used, the allocation between lecturers and tenured faculty. The reference to money was simply that the dean had priced out what this program cost, and it cost $3,500. But there was no evidence on this record that I'm aware of that suggested that Dr. Hong felt or said or articulated that anything was being done in violation of policy or cited to any policy that he claimed was violated. And I recall asking that question of him in his deposition. Now, will you address the qualified immunity, please? I will. Thank you. As we said in the brief, the question of the reach of Garcetti and the First Amendment into this intramural speech was murky. It was murky. As Garcetti was winding its way up to the court, the court's reservation or Justice Kennedy's reservation leads it to be murky. And it seems to me that that Dibble v. City of Chandler, the Ninth Circuit's opinion, in which, to paraphrase the court, in this area of First Amendment application, it is so specific, case-specific, and ill-developed, that qualified immunity would be the rule rather than the exception. And we submit that rather than the panel or the court venturing almost as an advisory opinion into the reaches of these issues of academic freedom and the like, the qualified immunity issue, we think, is fairly clear because this issue was so ill-developed. And, of course, the trial court never reached it because under Saussure v. Katz, which was the law of the land at that time, the order of proof was to find a constitutional right first and then ask whether it was clear and well-established. But in the interim, the U.S. Supreme Court decided Pearson v. Callahan, which said that the court has jurisdictional authority, if you will, to consider qualified immunity first before having to go and define the precise contours of the reach of the First Amendment. Should we do that in this case? Yes. You can. Should we do that in this case? Yes. I believe you should. We ask that you do. And we ask that the case be affirmed on the alternate basis, that this record makes clear as a matter of law that the individual defendants were entitled to qualified immunity without the necessity of going all the way into and laboring and defining in all of its different parameters the precise reach of the First Amendment in this narrow area of faculty department speech. It's much like what the U.S. Supreme Court just did in Quam v. City of Ontario, where they essentially said what they considered is their right of privacy. They analyzed it, and they said, well, we'll assume there's a right of privacy, but then we'll move on and we'll decide the case on another basis. I don't think that this Court has to embrace or decide the entire First Amendment issue, but can affirm on the basis of qualified immunity. With that, I'd like to reveal to Margaret Wu, unless the Court has questions. Thank you, counsel. Thank you. Good morning, Your Honors. Margaret Wu of the University of California. And I would like to address the immunity issues for Provost Godbertson in his official capacity and for the regents. I believe most of these issues we covered in our briefs. I just wanted to address a couple of clarifications of issues that Mr. Hong raised in his report. You're arguing absolute immunity under the 11th Amendment. Correct, Your Honor. And I would say also just Provost Godbertson and Assistant Provost Kalacki do join in the qualified immunity arguments that were just articulated in their individual capacities. So with regard to the regents' absolute immunity under the 11th Amendment, the reply brief suggests that somehow the regents are not immune, where there is a claim for injunctive relief that is clearly wrong under Pennhurst and the cases that we cited in our brief. The regents are absolutely immune under the 11th Amendment. With regard to Provost Godbertson's claim against Provost Godbertson in his official capacity, again, we addressed his 11th Amendment immunity there. The reply brief cites the Zimmerman Supreme Court case to suggest that an ongoing violation has been pled. That case is not on point at all. It didn't address 11th Amendment immunity at all. It addressed what was or what constituted a procedural due process claim, and that's not what's at issue here. Those were actually the only points I wanted to make, unless Your Honors have any questions. Now, is the record sufficiently developed for us to make that determination here? Or if we want to pursue the immunity issue, do we have to remand? I believe the record is clear. The issue is the district court did not reach it. That's why I raised the question. Correct, Your Honor. As I see it, this is a question of law. I don't see that there is any question of fact to be resolved, so I believe this Court can address that. Very well. Anything further? No, Your Honor. Thank you. Judge Gould has a question. Yes, Your Honor. I don't have a question for the appellees, but I have a suggestion if it's possible. Because the amicus arguments were focused so extensively on Garcetti and sort of national issues about academic freedom, but it could be we would decide the case on immunity. I would appreciate it if we could give Professor Hong an additional two minutes to argue so he can address the immunity issues. Very well. We will accommodate that request, Judge Gould. Anything further?  Thank you very much. Mr. Hong, at the request of Judge Gould, we would like to invite you to have two minutes to discuss only the immunity issue, not the other issue. And then Mr. Sanders still has a little bit of time to conclude his argument. I thank you very much for giving me two minutes. And for defendants to be qualified for qualified immunity, they should not know what they are doing. If they are absolutely ignorant about the law or if gross negligence, then qualified immunity will not be applied to their behavior. However, academic personnel manual, which is considered as a statute in the University of California, we all professors' life depends upon that. And if we violate any rules of the University of California, we will be disciplined based upon academic personnel manual 015. But my defendants are department chair, executive vice chancellor, and the dean who were professors before they became administrators. So they should have known that if they violate what is written in academic personnel manual, they will not be immunized or they will not be privileged to be exempted from their wrongdoing. For example, academic personnel manual clearly says professional rights include participation of approval of course contents and the manner of instruction. Academic personnel manual 015 says professional rights include participation of faculty in department faculty appointment and promotion processes. Now defendants and their counsel misread the academic personnel manual and lower court decision at 16 different places, erroneously substitute professional responsibility, professional duties for professional rights. Therefore, there is no room for them to be immunized by their ignorant act. Thank you. Thank you, Mr. Hong. Counsel. Thank you once again, Judge O'Scanlon. We would urge respectful consideration of Professor Hong's argument and his briefs on the immunity question. I would simply suggest if the court does decide to resolve this case on the immunity issue, that it still attempt to give guidance to courts in the future by noting that the district court was fundamentally wrong in analogizing this kind of academic speech to speech that in terms of Garcetti, an employer has commissioned or created. A university does not commission or create peer review or shared governance in academic matters. Those are things that are fundamental to the definition of an American university. A university that eliminated the faculty role in salary review, hiring, or academic policy would be an outcast. Yet, perversely, it is in that setting that under the district court's mistaken logic, the sort of speech that, like Professor Hong engaged in here, would actually enjoy the most robust First Amendment protection. That can't be what the Supreme Court intended in their study. Thank you very much, Counsel. The case just argued will be submitted for decision. And we will hear.
judges: O'scannlain, Gould, Ikuta